UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CYNTHIA STEWART, | CASE NO. C16-0020-JCC |
| Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | |
| SNOHOMISH COUNTY PUD NO. 1, | |
| Defendant. | |

This matter was tried to the Court from May 8, 2017 to May 12, 2017. The claims presented were whether Defendant failed to reasonably accommodate Plaintiff's disability, failed to afford her protected medical leave, and impermissibly fired her because of her disability. After bench trial and pursuant to Fed. R. Civ. P. 52(a), the Court makes the following findings of fact and conclusions of law[1]:

## I. FINDINGS OF FACT

1. Defendant Snohomish Public Utilities District No. 1 (the PUD) is a municipal corporation in Snohomish County. The PUD is an employer within the meaning of the Washington Law Against Discrimination (WLAD), the Family Medical Leave Act (FMLA), and the Washington Family Leave Act (WFLA).

---

[1] Any conclusion of law designated as a finding of fact shall be deemed a conclusion of law and any finding of fact designated as a conclusion of law shall be deemed a finding of fact.

2. Plaintiff Cynthia Stewart worked as a customer service representative (CSR) for the PUD for over 20 years. Her duties included assisting customers in person or over the phone with issues with their public utility services and billing. At all relevant times, Stewart was an employee within the meaning of the WLAD, the FMLA, and the WFLA.

3. The Court heard testimony from the following witnesses: Stewart; current and former PUD employees Sara Kurtz (employee resources), David Underwood (manager), Aaron Janisko (manager), John Gregory (manager), Brad Kime (shop steward), Kristi Treckeme (employee resources manager), Sarah Scott (former manager), Cyndy Nance (manager), Derek Hermann (manager), Lynn Wheeler (retired CSR), and Amy Murray (shop steward); Stewart's treating physician, Dr. Phillip O. Smith; Stewart's medical expert Dr. Daniel Krashin; the PUD's medical expert, Dr. Lawrence Murphy; Stewart's sister, Suzette Nielson; vocational expert Neil Bennett; and economist expert Dr. Paul Torelli. The Court also reviewed the deposition testimony of PUD assistant general manager James West in lieu of live testimony.

*Stewart's Medical Condition*

4. Stewart suffers from chronic and debilitating migraines. She has dealt with this condition for most of her adult life and for the entire time she worked at the PUD. When Stewart experiences a migraine, she can appear pale with droopy eyes.

5. Most recently, Stewart has treated her migraines with non-narcotic medications called Immitrex and Maxalt and, if these medications do not stop a migraine, with the narcotic pain reliever Dilaudid. Stewart's primary care provider, Dr. Phillip O. Smith, prescribed these medications and administers the Dilaudid by way of an injection.

6. Narcotic medications, such as those Stewart takes for her migraines, can cause confusion, sleepiness, slurred speech, and an itchy feeling.

7. The PUD produced evidence that Dilaudid injections are contraindicated for migraine treatment. However, Dr. Smith testified credibly that he prescribed the injections for that

purpose. The propriety of Dr. Smith's medical care is not the subject of this trial. The Court accepts his and Stewart's testimony that the narcotic injections were administered to treat Stewart's migraines.

8. If Stewart cannot use the medications to curb the progression of her migraines, the migraines can prevent her from functioning or working for a period of two to three days. As a result, Stewart would periodically take time off work to receive a pain-reducing injection.

9. Stewart testified that she was eager to effectively treat her migraines so she could return to work, that she did all she could to minimize the impact of her absences, and that she takes these drugs purely for medical reasons. The Court finds this testimony credible.

10. Up until October 2014, Dr. Smith advised Stewart that she could return to work a short time after receiving an injection.

*The PUD's Fitness for Duty Policy*

11. The PUD has a "Fitness for Duty" policy that prohibits all PUD employees from working under the influence of drugs or alcohol.

12. The PUD trains management-level employees to observe signs of impairment and to fill out a "Reasonable Suspicion Checklist" with numerous appearances or behaviors that might indicate impairment. When a manager observes any of the behaviors on the checklist, the PUD authorizes him or her to refer the employee for drug and alcohol testing.

13. Referring an employee for drug and alcohol testing can result in discipline, up to and including termination.

14. The Fitness for Duty policy makes no exceptions for employees who take prescription medications to treat their disabilities.

*The PUD's Earlier Handling of Stewart's Condition*

15. For many years, Ms. Stewart worked in the Snohomish satellite office of the PUD. The satellite office was considerably smaller than the PUD's main headquarters in Everett, with

only three or four CSRs on staff at any given time.

16. For much of her time at the satellite office, Stewart's supervisors and coworkers informally accommodated her condition by covering for her when she had to go to the doctor to receive treatments.

17. In about September 2013, however, Stewart's supervisor, David Underwood, began expressing and documenting frustration with her attendance and informal communication about medical leave. In his notes, Underwood wrote that he told Stewart about "the need for her to be here and able to work." He also wrote that he told her he needed "to have someone here on a more consistent basis" and "the frequency of absenteeism needs to change." On December 24, 2013, he told Stewart that "all this time off is a problem." When Stewart left for treatment, Underwood would instruct her to "try to get in as soon as possible." At trial, Underwood confirmed that he made these statements and that he was frustrated by the frequency of Stewart's absences.

18. In early 2014, another manager, Aaron Janisko, began sharing supervisory duties with Underwood. Janisko and Underwood both attended a March 2014 meeting with Stewart where they expressed dissatisfaction about the informality of, and level of communication about, her medical leave. Janisko and Underwood also told her that they "still have business needs that need to be taken care of" and that if she continued to be absent so frequently, they would have to rethink the structure of their CSR schedule.

19. Stewart then applied for intermittent medical leave under the FMLA to take off a few hours at a time to go to her doctor for migraine treatment. The PUD approved her intermittent leave on April 25, 2014. The approval memorandum stated: "Your physician estimates you need to be off work due to episodic flare-ups of 3 days per week for approximately 2 hours to 1 day per episode."

20. Later that year, Janisko began to suspect that Stewart was abusing her FMLA leave. He sent regular e-mails to the PUD's employee resources specialist, Sara Kurtz, pointing out

what he believed was a suspicious pattern of Stewart taking leave on Mondays and Tuesdays. He told Kurtz that this frustrated him.

21. Both Stewart and Dr. Smith testified that her migraines often occurred at the beginning of the work week and that they tried to determine why this was happening. Their working hypothesis is that, over the weekends, Stewart attempted to stave off her migraines so she could enjoy time with her family and this, along with the stress of returning to work, caused her to have migraines more frequently on Mondays or Tuesdays. The Court finds their testimony credible as to the legitimacy of Stewart's early-in-the-week migraines and her lack of abuse of FMLA leave.

*The October 2014 Incident*

22. On October 17, 2014, Stewart took intermittent medical leave for the fifth time in five days. She went to Dr. Smith's office for a pain-reducing injection to treat a migraine. She left the office around 9:30 a.m., received the injection, and returned to work promptly afterwards. At the time, Dr. Smith had advised her that she would be able to return to work without a post-injection rest period.

23. When Stewart arrived, Janisko called her into his office and reprimanded her for an absence the day before without his permission. Stewart responded that she had told him about a pre-planned medical appointment. Stewart became upset and started to cry. Janisko sent Stewart back to her desk where she worked for a period of time.

24. Janisko then called John Gregory, a manager at another PUD office. Janisko told Gregory he believed an employee was impaired and requested a second observer for the Reasonable Suspicion Checklist.

25. When Gregory arrived, Janisko called Stewart back to his office, along with her union shop steward, Brad Kime. Kime and Stewart spoke privately before the meeting. When Kime told Stewart that Janisko suspected she was impaired, she again became upset.

26. During the meeting, Janisko told Stewart he believed she was impaired and would be

referring her for drug testing. Again, Stewart started to cry. At the end of the meeting, Janisko again sent Stewart back to her desk to work.

27. While Stewart worked, Janisko called senior employee resources specialist Kristi Treckeme, who approved his decision to send her for drug testing.

28. As support for his decision to send Stewart for drug testing, Janisko stated that he observed that Stewart "had slurred speech" and "appeared to be in a slower state of mind." He further noted that Stewart seemed "sleepy" and "drowsy," had "glassy eyes" and "droopy eyelids," and was "pale" and "fumbling."

29. Gregory noticed Stewart slurring, but thought it was because she had been crying. Gregory did not notice Stewart being sleepy, although he thought she seemed "slow." Gregory testified that he did not know if Stewart was impaired and that it was "hard to tell" the cause of her behavior. When asked whether he would have referred Stewart for drug testing based solely on what he saw, Gregory responded "probably no."

30. Kime stated that he "did not notice anything about her behavior that was out of the ordinary" and that "Stewart did not appear to me to be impaired by drugs or alcohol based on my limited knowledge of her normal behavior and physical condition."

31. Based on the observations by Janisko and Gregory, as well as the medical testimony as to the likely effects of narcotic medications, the Court finds it more probable than not that Stewart exhibited signs of impairment at work on October 17, 2014.

32. However, the PUD has not shown that any impairment prevented Stewart from properly performing her job that day. The PUD argues that the signs of impairment observed by Janisko, such as her slurred speech and inability to articulate herself, demonstrate that she was unable to perform as a CSR. However, this argument is belied by the fact that Janisko twice sent Stewart back to work after observing those symptoms. Moreover, the stressful and upsetting nature of the interactions with Janisko is distinct from the routine nature of answering customer calls. Particularly because Gregory and Kime did not agree with

Janisko as to the extent of Stewart's impairment, the Court cannot simply assume that Stewart's symptoms rendered her unable to perform her job.

33. Stewart denied being impaired at work on October 17, 2014. Although the Court found that others observed signs of impairment that day, the Court does not believe that Stewart was being dishonest. Based on the evidence presented, the Court finds that Stewart's perception of her post-injection condition differs from how others may perceive her.

34. About an hour after their meeting, Janisko and Gregory drove Stewart to U.S. Healthworks for drug testing. They informed her she would be on paid administrative leave while the PUD investigated her. Stewart testified that she felt great stress and humiliation during this ordeal.

*The PUD's Response to the October 2014 Incident*

35. Stewart informed Dr. Smith about the incident. On October 21, 2014, he wrote the PUD a letter explaining that Stewart "gets frequent injection[s] for her migraines; while they are more effective if she is able to rest after her shot, she is not impaired and is able to work without restrictions."

36. On October 28, 2014, Stewart met with Kurtz, Treckeme, and union shop steward Amy Murray. Kurtz and Treckeme inquired about Stewart's health condition and medications. Stewart explained that Dr. Smith treated her migraines with certain prescription pain medications that he administered at his office when she had to leave work due to a migraine. Stewart told them she had taken these medications for several years and did not feel impaired after waiting a short while after taking them before returning to work.

37. Treckeme and Kurtz also asked about Stewart's pattern of taking leave on Mondays and Tuesdays. Stewart explained that Dr. Smith was aware of this pattern and believed it was caused by Stewart finding a way to push off migraines when she was trying to spend time with her family, along with the stress of returning to work.

38. Also on October 28, U.S. Healthworks' medical review officer, Dr. Donald Bucklin, issued

his final evaluation of Stewart's drug test. The test showed the presence of hydromorphone in her system. Dr. Bucklin further noted a "safety sensitive warning for potentially sedating medication." No one at the PUD contacted U.S. Healthworks as to how the results should be interpreted.

39. Stewart did not have a "safety sensitive" position at the PUD.

40. The PUD subsequently sent Dr. Smith a "Fitness for Duty Questionnaire" and an "FMLA Recertification Questionnaire."

41. On November 19, 2014, Dr. Smith responded to the Fitness for Duty Questionnaire. He explained the medications Stewart took to treat her migraines, that those medications could result in a positive drug test, and that a "positive" drug test did not necessarily mean impairment. He also stated that the medications could be impairing for three to four hours after administration, leading him to recommend that Stewart stay away from work for three to four hours following the administration of a Dilaudid injection.

42. On December 1, 2014, Dr. Smith responded to the FMLA Recertification Questionnaire, which addressed whether Stewart used her leave appropriately. Dr. Smith stated that he did not believe Stewart took leave inappropriately, but that it was "quite the opposite" because Stewart was eager to return to work. Dr. Smith also testified at trial that Stewart was motivated and anxious to work and strove to minimize the negative impact her migraines had on her attendance. The Court finds this testimony credible.

43. The PUD ultimately concluded that Stewart was impaired at work on October 17, 2014. This conclusion was based on the Reasonable Suspicion Checklist signed by Janisko and Gregory and the positive drug test results.

44. The PUD interpreted the drug tests as indicating impairment because Stewart had concentrations of hydromorphone in her system that exceeded the "cutoff value." Stewart's medical expert, Dr. Daniel Krashin, who specializes in pain management, testified that this type of measurement is "useless" for determining potential impairment. Dr. Krashin

explained that, instead, the cutoff value is intended to prevent false positive test results, *e.g.*, to ensure that an employee had truly consumed an opiate drug rather than a poppy seed muffin.

45. The PUD's medical expert, Dr. Lawrence Murphy, did not offer testimony regarding the significance of the drug test results. Dr. Murphy opined that Stewart had been impaired based on Janisko's and Gregory's observations and the received dosage of Dilaudid. Dr. Murphy agreed that medication metabolism can be highly individualized.

*The Return to Work Agreement*

46. The PUD's Fitness for Duty Policy mandates that, after an employee's first positive drug test result, he or she must sign a Return to Work Agreement. Failure to follow such an agreement would result in the employee's termination. After concluding that Stewart had been impaired at work, the PUD told her that she must sign a "Return to Work Agreement" as a condition of her continued employment.

47. The Return to Work Agreement stated that Stewart would be fired if she came to work while impaired. The Agreement made no exception for the medications the PUD knew Stewart took to treat her migraines. The Agreement also stated that Stewart would be fired if she ever tested positive for potentially job-impairing medications. It further conditioned her return to work on submission to a drug dependency screening by a substance abuse professional and another drug test.

48. Feeling she had no other choice, Stewart signed the Return to Work Agreement on December 16, 2014. The next day, the PUD recertified Stewart's intermittent FMLA leave. The recertification stated that Stewart should stay away from work for four hours after receiving potentially impairing treatments, consistent with Dr. Smith's recommendation.

49. Once Stewart signed the Agreement, the PUD removed her from paid leave status. However, she was not permitted to return to work until completing the drug dependency screening and second drug test. On December 24, 2014, Stewart ran out of vacation leave.

The PUD denied her the ability to use sick leave while she remained on forced leave, stating that it had no information to suggest that her current leave was the result of a medical issue.

50. Stewart remained on forced leave until January 12, 2015. During that time, she went through a drug dependency screening conducted by social worker and chemical dependency professional Christy Caldwell. Caldwell found that Stewart did "not meet the criteria for a substance use disorder." Caldwell also confirmed that Stewart had "never obtained prescriptions from multiple providers or taken more medication than prescribed" and that Dr. Smith "has never been concerned that [Stewart] is abusing her prescribed medications." Caldwell concluded that there was no need for drug treatment, but that Stewart would benefit from counseling to explore her sources of stress. Caldwell also noted that "it appears [Stewart] is not aware of how she presents to others after receiving a shot of her prescribed medication."

51. Stewart also took another drug test, which again showed a presence of hydromorphone in her system.

52. Stewart testified that it was humiliating to be assessed by the drug dependency screener and be submitted to another drug test. She felt that she was treated like an addict.

*Stewart Returns to Work*

53. The PUD allowed Stewart to return to work on January 12, 2015.

54. While she was on leave, Stewart applied for a transfer to the PUD's Everett headquarters. Stewart did so to minimize the impact of her leave on her coworkers by joining a larger pool of CSRs who could more easily absorb absences. The PUD awarded her the transfer.

55. Stewart's new manager was Sarah Scott. Before Stewart returned to work, Scott spoke with Janisko and Kurtz about Stewart's recent disciplinary history and reviewed Stewart's Return to Work Agreement.

*The April 2015 Incident*

56. On the morning of April 7, 2015, Stewart left work to receive treatment for a migraine.

57. Shortly after Stewart left, Scott inquired with the payroll department as to how much leave time Stewart would have left after taking leave that day.

58. Stewart returned to work roughly four hours after receiving treatment.[2] She did not feel impaired when she resumed her duties.

59. Scott called Stewart into her office shortly after Stewart returned to her work station. Scott informed Stewart that she no longer had enough leave time to take a planned family trip to Boston later that month. This information upset Stewart, who struggled to communicate a response to Scott and became increasingly distressed as the meeting went on. According to Scott, Stewart "stammered and slurred her words" and was "rambling and difficult to follow." Scott further noted that Stewart "was fidgeting, repeatedly playing with the corners of her mouth, and appeared to be struggling to communicate her thoughts."

60. Scott sent Stewart back to her work station to handle calls. Scott then told fellow manager Cyndy Nance that she believed Stewart might be impaired. Scott asked Nance to observe Stewart while she worked and report back with her observations.

61. Nance stood near Stewart while she interacted with a customer on the phone. She told Scott she thought Stewart sounded agitated and confused. The two of them listened in on the call and Scott agreed with Nance's assessment. Scott testified that Stewart interrupted the customer and had a bit of an "edge" during the call. Scott also heard Stewart say, "It's clear you're having trouble understanding me, I'm going to get an interpreter." Scott and Nance heard the call disconnect and Stewart call the customer back.

62. Stewart testified that the customer did not speak English as her first language and had called about a particularly complicated issue with her service and bill. Stewart attempted to assist

---

[2] To the extent the PUD argues that Stewart returned before the four-hour period elapsed, the evidence shows that Stewart was, at most, 15 minutes early. The evidence also shows the imprecise nature of determining how long medications will impair a particular person and that Stewart felt pressure to return to work as soon as possible. The Court thus finds this 15-minute window insignificant.

her but the language barrier prevented her from doing so in an effective manner. She tried to connect the customer to the PUD's language line so an interpreter could assist but accidentally disconnected the call. Multiple witnesses testified that, at the time, it was fairly common for calls to the language line to get disconnected. Stewart immediately called the customer back and addressed her problem.

63. Scott asked another manager, Derek Hermann, to talk to Stewart to see if she seemed impaired. Hermann had a brief conversation with Stewart. He noticed some slight slurring but testified that he would not have referred her for drug testing based solely on what he saw.

64. Scott and Nance then filled out a Reasonable Suspicion Checklist. The checklist stated that Stewart had slurred, rambling speech; seemed calm, sleepy, and confused; had droopy eyelids, was pale, and rubbed the corners of her mouth; was having trouble swallowing; and struggled to communicate.

65. Nance testified that she would not have referred Stewart for drug testing based solely on what she saw. She stated that referrals for drug testing are serious matters that could lead to discipline, including termination.

66. Murray and retired CSR Lynn Wheeler both testified that they spoke with Stewart that day and did not observe anything about Stewart's appearance, demeanor, or speech that was out of the ordinary. Both Murray and Wheeler had known Stewart for years and were familiar with how she looked and behaved.

67. Based on the observations by Scott, Nance, and Hermann, as well as the testimony as to the likely effects of Stewart's medications, the Court finds it more probable than not that Stewart exhibited some signs of impairment on April 7, 2015. While the Court also finds Murray's and Wheeler's testimony credible, it is possible that Stewart exhibited signs of impairment at some times and not others.

68. Again, however, the Court finds that the PUD did not show that Stewart's impairment

1    prevented her from properly performing her job that day. The argument that her symptoms
2    rendered her necessarily unable to do her job is contradicted by the fact that Scott sent
3    Stewart back to work after observing them. Given that Nance viewed Stewart's symptoms
4    as not serious enough to warrant a drug test, and Murray and Wheeler did not think that
5    Stewart exhibited any signs of impairment, the Court will not assume that Stewart's
6    symptoms rendered her unable to perform her job. The only actual evidence regarding
7    Stewart's job performance is the dropped phone call. However, the Court finds Stewart's
8    explanation credible, given the language barrier, the upsetting conversation she had earlier
9    with Scott, and the frequency of accidental dropped calls at that time.

10   69. Stewart denied being impaired at work on April 7, 2015. Again, the Court does not find
11       that Stewart was being untruthful, given that the evidence shows Stewart's perception of
12       the situation differed from others' perceptions.

13   70. Scott called Kurtz and they, along with Nance and Murray, met with Stewart to discuss her
14       suspected impairment. Stewart explained that she had been to the doctor for treatment that
15       morning, that she had followed her doctor's recommendation to wait four hours prior to
16       returning to work, and that she did not feel impaired when she returned to work.

17   71. Kurtz instructed Scott and Hermann to drive Stewart to U.S. Healthworks for drug testing.
18       The PUD placed Stewart on paid administrative leave pending the test results.

19   *Stewart's Termination*

20   72. The drug test again showed that Stewart had hydromorphone in her system. Again, no one
21       at the PUD contacted U.S. Healthworks as to how the results should be interpreted.

22   73. Kurtz, Treckeme, and PUD assistant general manager James West testified that
23       termination was the only option discussed after receiving this positive result.

24   74. On April 15, 2015, West sent Stewart a letter stating that the PUD intended to terminate
25       her employment because she violated the Fitness for Duty Policy and the Return to Work
26       Agreement by coming to work while impaired.

75. Stewart responded with a letter explaining her medical condition and expressing concern that the PUD was discriminating against her because of her disability.

76. On May 5, 2015, the PUD sent Stewart a notice of termination, rejecting the assertion that it had discriminated against her. The letter stated: "While your medical condition may constitute a disability that is protected under the Americans with Disability [sic] Act (ADA) and the Washington Law Against Discrimination (WLAD), being at work under the influence of narcotic medication (whether lawfully prescribed or not) and demonstrating impairment is not protected."

## II. CONCLUSIONS OF LAW

77. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331.

78. Venue is properly set in the United States District Court, Western District of Washington pursuant to 28 U.S.C. § 1391.

### WLAD Claims

79. The WLAD prohibits employment discrimination based on a sensory, mental, or physical disability. Wash. Rev. Code §§ 49.60.030(1), 49.60.180(1).

80. There are two types of disability discrimination claims under the WLAD: failure to accommodate and disparate treatment. *Clipse v. Commercial Driver Servs., Inc.*, 358 P.3d 464, 472 (Wash. Ct. App. 2015). Stewart makes both claims.

#### *Disability*

81. The Court first addresses the issue of whether Stewart's condition constitutes a disability. Under the WLAD, a disability is "the presence of a sensory, mental, or physical impairment that (i) is medically cognizable or diagnosable; or (ii) exists as a record or history; or (iii) is perceived to exist whether or not it exists in fact." Wash. Rev. Code § 49.60.040(7)(a).

82. The Court has already concluded as a matter of law that Stewart's migraines constitute a disability under the WLAD. (Dkt. No. 53 at 6.)

83. Regarding the symptoms of Stewart's migraine medication, the Court makes the same

finding. First, under Washington law, "the side effects of a prescription drug may constitute a disability, so long as those side effects meet the statutory definition." *Clipse*, 358 P.3d at 473. The parties produced evidence to show that the side effects of Dilaudid constitute a mental or physical impairment. And, although Stewart maintained that she was not impaired by the medication, this is irrelevant because the PUD evidently perceived the impairment to exist. *See* Wash. Rev. Code § 49.60.040(7)(a)(iii).

84. Moreover, for purposes of the WLAD, "conduct resulting from a disability is considered part of the disability, rather than a separate basis for termination." *Humphrey v. Memorial Hospitals Ass'n*, 239 F.3d 1128, 1139-40 (9th Cir. 2001); *see also Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087, 1093 (9th Cir. 2007). In *Gambini*, a bipolar employee was fired for violent outbursts that the record showed were "arguably symptomatic of her bipolar disorder." 486 F.3d at 1094. Accordingly, Gambini was entitled to have the jury decide whether her outbursts were caused by her disability. *Id.* at 1095. If the jury answered in the affirmative, such conduct could not result in Gambini's termination. *Id.*

85. This Court has already noted a distinction between this case and *Gambini*, namely that Gambini's violent outbursts were a symptom of her disability itself, while Stewart's alleged impairment is a symptom of the treatment for her disability. However, the *Gambini* court also indicated that symptoms of medication can play a role in this analysis. *See id.* at 1094 (noting that "Gambini was in the throes of a medication change, which heightened the volatility of the mood swings that she and her health care providers were trying to get under control").

86. Here, there is no evidence that Stewart's impairment was caused by anything other than her migraine medication, and the Court has found that Stewart took such medication solely for treatment purposes. Stewart also produced evidence that, without the Dilaudid injections, she would be unable to work—or do much of anything, for that matter—for protracted periods of time. In this way, the side effects of the medication have become part

of her underlying disability. Accordingly, the symptoms of Stewart's migraine treatment should be treated as protected conduct resulting from her disability.

87. The Court again expresses its concern that the question of narcotics in the workplace should be approached carefully. In reaching the conclusions herein, the Court does not intend to hold that any use of prescription narcotics in the workplace is automatically protected. However, on these circumstances, the Court finds it appropriate to extend the WLAD's protection to Stewart's medication symptoms. To afford citizens with disabilities sufficient protection, circumstances like this must be appreciated.[3]

88. This result is also consistent with case law addressing the Americans with Disabilities Act (ADA). *See, e.g.*, *McAlindin v. County of San Diego*, 192 F.3d 1226 (9th Cir. 1999). In *McAlindin*, the Ninth Circuit recognized that "a disability may remain either due to symptoms of the condition itself which persist despite the effects of medication, or as a result of the medication's side-effects." *Id.* at 1236. McAndlin produced evidence that his HIV treatment disrupted his normal sleep patterns, causing him to fall asleep at work. *Id.* at 1235. The Ninth Circuit thus found that he raised a genuine issue of material fact as to the existence of a disability. *Id.* at 1236. This indicates that treatment-related symptoms should be viewed as an extension of a person's disability.

89. The WLAD does not apply where the "disability prevents the proper performance of the particular worker involved." Wash. Rev. Code § 49.60.180(1). Here, however, the PUD does not show that the effects of Stewart's medication—whether real or perceived—prevented her from properly performing her job. Any impairment she suffered was temporary; it did not render her inherently and perpetually unable to work. It was not her goal to work while impaired. Rather, she returned when she felt that she was capable of

---

[3] It should also be noted that the WLAD provides a safeguard for employers where the "disability prevents the proper performance of the particular worker involved." Wash. Rev. Code § 49.60.180(1). As discussed, this provision does not apply in this particular case.

1    working, while also feeling pressure from the PUD to return to work as soon as possible.

2    During the incidents in question, the evidence does not persuade the Court that Stewart was

3    unable to properly perform her job. In other words, this is a disability that could have been

4    reasonably accommodated and otherwise did not interfere with her job performance.

5    Accordingly, this provision does not apply.

6    90. In sum, the Court finds that both Stewart's migraines and the symptoms of her migraine

7    medication warrant protection under the WLAD.

8    *Reasonable Accommodation*

9    91. The WLAD requires an employer to take steps "reasonably necessary to accommodate an

10   employee's condition." *Riehl v. Foodmaker, Inc.*, 94 P.3d 930, 934 (Wash. 2004). Failure

11   to provide reasonable accommodations "constitutes discrimination unless the employer can

12   demonstrate that such accommodation would result in an undue hardship to the employer's

13   business." *Johnson v. Chevron U.S.A., Inc.*, 244 P.3d 438, 443 (Wash. Ct. App. 2010)

14   (internal quotations omitted). The WLAD "does not limit the employer to only one attempt

15   at accommodation." *Frisino v. Seattle Sch. Dist.*, 249 P.3d 1044, 1051 (Wash. Ct. App.

16   2011). A good faith interactive process is required, during which the "duty to accommodate

17   is continuing." *Id.*

18   92. There are four elements of a reasonable accommodation claim:

19       (1) the employee had a sensory, mental, or physical abnormality that
20       substantially limited his or her ability to perform the job;
         (2) the employee was qualified to perform the essential functions of the job
21       in question;
         (3) the employee gave the employer notice of the abnormality and its
22       accompanying substantial limitations; and
         (4) upon notice, the employer failed to affirmatively adopt measures that
23       were available to the employer and medically necessary to accommodate the
         abnormality.
24

25   *Riehl*, 94 P.3d at 934.

26   93. *Disability:* As discussed above, Stewart's impairment, as perceived by the PUD,

substantially limited her ability to perform the job.

94. *Qualifications*: There is no dispute that Stewart, when not impaired, was qualified to perform the job's essential functions. She had been doing so for two decades.

95. *Notice*: Stewart repeatedly informed the PUD that she had chronic migraines and that those migraines required narcotic injections. At the time of Stewart's termination, the PUD was also aware that the injections could cause impairment for four hours afterward. The Court thus concludes that the PUD was given adequate notice of Stewart's condition.

96. *Responsive Measures*: The PUD chose to address Stewart's medication symptoms through a disciplinary process, rather than an interactive one aimed at finding a reasonable accommodation that would allow Stewart to work and seek treatment for her disability. This can first be seen in October 2014, when the PUD decided to send Stewart for drug testing and place her on administrative leave, despite the fact that it knew Stewart took narcotic medications to treat her migraines. The Return to Work Agreement further demonstrates the disciplinary nature of the PUD's actions: it required Stewart not only to abstain from working while impaired, but also stated that Stewart would be fired if she ever tested positive for potentially job-impairing medications. Absent from this agreement was any acknowledgment of Stewart's disability or an attempt to accommodate it. And, while the PUD did modify Stewart's FMLA certification to reflect the four-hour post-injection period, when it became apparent to the PUD that four hours may not be enough, the PUD fired Stewart without considering other alternatives. This fell far short of the PUD's duty to affirmatively adopt reasonable accommodation.

97. The PUD maintains that, by insisting that she was not impaired by her medication, Stewart failed to uphold her duty to communicate about the accommodations she required. This mischaracterizes the circumstances. Stewart communicated clearly about her need to intermittently receive the Dilaudid injections. While she did not feel that the injections affected her ability to work, it is not as if she rejected any accommodation offered her by

the PUD. Instead, when the PUD immediately pursued disciplinary action against her, Stewart defended her choice to return to work, against an insinuation that she was a drug abuser. This was not a failure to engage in the interactive process. While it should not always be incumbent on the employer to steer the accommodation discussion, given the facts in this case, the PUD should have done more.

98. The PUD further argues that, if the medication had longer-lasting effects, Stewart was free to remain at home until she was able to work and would not have faced negative consequences for deciding to do so. However, the evidence shows that Stewart faced pressure from the PUD to return to work as soon as possible. Even if the additional leave was technically available, the Court cannot conclude that this was a reasonable accommodation provided by the PUD.

99. Alternative accommodations are not difficult to conjure. The PUD could have extended the post-injection period or instructed Stewart never to return to work on the day she received potentially impairing treatment. It could have required her to check in with a designated employee before returning to work so the PUD could determine whether it felt comfortable with her condition. It could have allowed her to return to work but asked her to take a break or go home if it concluded she seemed impaired and unable to perform the essential functions of her position. In short, it could have treated her as an employee with a medical condition, rather than a drug abuser.

100. The PUD argues that it would be an undue hardship to allow Stewart to work while under the influence of narcotics. To be clear, the PUD was not required to allow Stewart to work while under the influence of narcotics if those narcotics prevented her from doing her job properly. *See Johnson*, 244 P.3d at 443 (employer not required to provide accommodation that would constitute an undue hardship). However, it was not entitled to immediately discipline her for being impaired due to her disability. But that is what the PUD did.

101. The Court concludes that the PUD took disciplinary action against Stewart rather than

engaging in any valid interactive process and thus failed to reasonably accommodate her disability as required by the WLAD.

### *Disparate Treatment*

102. The WLAD prohibits an employer from discriminating against a person because of a disability if that person is qualified to do the job. Wash. Rev. Code § 49.60.180; *Hines v. Todd Pac. Shipyards Corp.*, 112 P.3d 522, 529 (Wash. Ct. App. 2005). To establish a claim for disparate treatment under the WLAD, a disabled employee must prove that her disability was a "substantial factor" in the employer's decision to take an adverse employment action against her. *MacKay v. Acorn Custom Cabinetry, Inc.*, 898 P.2d 284, 288 (Wash. 1995).

103. Here there is no question about the causal link between the symptoms of Stewart's medication and the adverse employment actions taken against her. It is uncontested that, because of Stewart's perceived impairment, the PUD: (1) drug tested Stewart and placed her on administrative leave; (2) required Stewart to undergo a drug dependency evaluation and an additional drug test in December 2014; (3) required Stewart to sign a Return to Work Agreement as a condition of her returning to work; and (4) terminated Stewart.

104. Because the symptoms of Stewart's medication constitute disability-protected conduct, they could not legally be the basis for her termination. In taking adverse employment action against her for such conduct, the PUD violated the WLAD.

### *Affirmative Defenses*

105. *Business Necessity*: The PUD maintains that the business necessity defense applies here and justifies its conduct. It is unclear whether the business necessity defense applies to disparate treatment claims. *See Kries v. WA-SPOK Primary Care, LLC*, 362 P.3d 974, 993 (Wash. Ct. App. 2015) ("[T]he bona fide occupational qualification, not the business necessity, defense applies in disparate treatment cases."); *but see Shannon v. Pay 'n Save*

1     *Corp.*, 709 P.2d 799, 806 (Wash. 1985) (applying business necessity defense in

2     employment discrimination case), *abrogated on other grounds by La.-Pac. Corp. v.*

3     *Asarco Inc.*, 934 P.2d 685 (Wash. 1997); *Kastanis v. Educ. Emps. Credit Union*, 859

4     P.2d 26, 31 (Wash. 1993) (treating the two defenses as the same).

5 106.  However, the Court need not decide whether the business necessity defense is applicable

6     to Stewart's claims, because the Court found that the PUD failed to prove Stewart's

7     perceived impairment prevented her from properly performing her job. Thus, the PUD

8     has shown no business necessity justifying its conduct.

9 107.  *BFOQ:* The PUD also raises the bona fide occupational qualification (BFOQ) defense.

10     To establish a BFOQ defense, the employer must "have a factual basis for believing that

11     all or substantially all persons who lack the qualification would be unable to safely and

12     efficiently perform the duties of the job, or be able to prove that some excluded

13     employees would be unable to perform safely and efficiently and it is impossible or

14     highly impractical for the employer to distinguish the employees who do or do not present

15     the risk." *Fey v. State*, 300 P.3d 435, 442 (Wash. Ct. App. 2013). The exception is narrow;

16     as an example, the *Fey* court offers the requirement that a wet nurse be a female. *Id.*

17 108.  The PUD maintains that the qualification of not being impaired at work bears a strong

18     correlation with the ability to safely and efficiently perform the duties of Stewart's job.

19     However, there was unrebutted testimony that Stewart's CSR position was not safety-

20     sensitive. *Compare Rhodes v. URM Stores, Inc*., 977 P.2d 651, 655 (1999) ("[T]he

21     inherent dangers in driving a truck on public roads while under the influence of mind-

22     altering drugs supports application of a safety-sensitive BFOQ."). Moreover, Stewart did

23     not seek to be permitted to work while high; rather, she sought to have the symptoms of

24     her medication accommodated as an extension of her migraine condition. Any impairment

25     was temporary and for treatment purposes. It was not an inherent quality that rendered

26     Stewart incapable of performing the task at hand. The Court rejects the PUD's BFOQ

1    defense.

2    109. *Good Faith:* The PUD further argues that its managers had a good faith belief that Stewart

3         was impaired at work, which they responded to in accordance with PUD policy. But it is

4         irrelevant whether the PUD was justified in believing that Stewart was impaired, because

5         the impairment itself was the protected disability. The problem is that the PUD's policy

6         did not account for someone with such a disability. The Court rejects the PUD's good

7         faith defense.

8    110. Accordingly, the Court enters judgment in favor of Stewart on her reasonable

9         accommodation and disparate treatment claims under the WLAD.

10                                          **FMLA Claims**

11   111. The FMLA entitles an employee to "a total of 12 workweeks of leave during any 12-

12        month period" if the employee has "a serious health condition that makes the employee

13        unable to perform the functions of the position of such employee." 29 U.S.C.

14        § 2612(a)(1). An employer may not "interfere with, restrain, or deny the exercise of or

15        the attempt to exercise, any right provided" under the FMLA. 29 U.S.C. § 2615(a)(1). To

16        prevail on a claim of FMLA interference, a plaintiff must show by a preponderance of

17        the evidence that his or her taking of FMLA leave was a negative factor in the defendant's

18        decision to take adverse employment action against the plaintiff. *Xin Liu v. Amway Corp.*,

19        347 F.3d 1125, 1135-36 (9th Cir. 2003) (internal quotations omitted); 29 C.F.R.

20        § 825.220(c).

21   112. The WFLA "mirrors its federal counterpart and provides that courts are to construe its

22        provisions in a manner consistent with similar provisions of the FMLA." *Crawford v. JP*

23        *Morgan Chase NA*, 983 F. Supp. 2d 1264, 1269 (W.D. Wash. 2013) (internal quotations

24        omitted); Wash. Rev. Code § 49.78.290.

25   *Serious Health Condition*

26   113. The FMLA defines a "serious health condition" as "an illness, injury, impairment, or

1  physical or mental condition that involves (A) inpatient care in a hospital, hospice, or

2  residential medical care facility; or (B) continuing treatment by a health care provider."

3  29 U.S.C. § 2611(11). The WFLA defines a serious health condition similarly, with

4  added guidance as to what constitutes continuing treatment by a healthcare provider. *See*

5  Wash. Rev. Code § 49.78.020(16)(a)(ii).

6  114. This Court has already found that Stewart's migraines constitute a serious health

7  condition under the FMLA and the WFLA.[4]

8  *Interference*

9  115. Stewart fails to show by a preponderance that the PUD used her taking of FMLA leave

10  as a negative factor when it disciplined her in 2014 and fired her in 2015. While the

11  record contains some evidence that her managers were frustrated with her absences, it is

12  also apparent that the PUD was chiefly concerned about Stewart's suspected drug abuse.

13  116. As discussed above, the record shows that Stewart exhibited signs of impairment while

14  at work and the PUD's disciplinary actions were in response to such impairment.

15  Stewart's taking of leave necessarily correlated with the perceived impairment because

16  both stemmed from her migraine treatment. However, there is insufficient evidence to

17  establish a causal connection between Stewart's taking of leave and the adverse

18  employment actions. Rather, the overwhelming evidence shows that the PUD's

19  disciplinary actions were motivated by Stewart's presence at work while seemingly

20  impaired.

21  117. For example, when Stewart returned to work, the PUD recertified her FMLA leave to

22  include a provision requiring her to take more time away from work when she may be

---

24  [4] The parties do not address whether the symptoms of Stewart's migraine medication constitute an independent serious health condition. However, the question here is not whether Stewart was entitled to take FMLA leave to address her symptoms. In fact, her FMLA recertification explicitly acknowledged the impact of her symptoms. Thus, this matter requires no further discussion.

impaired. This demonstrates the PUD's focus on Stewart's condition while she was at work, rather than simply making sure she was there.

118. The Court acknowledges the evidence that Underwood and Janisko scrutinized and expressed frustration about Stewart's absences. However, it was not until Janisko observed signs of impairment that he sent Stewart for drug testing. Viewing the record as a whole, the Court concludes that Janisko disciplined Stewart based on his belief she was impaired, not his frustration that she had been frequently absent.

119. The Court makes the same conclusion as to Scott. Stewart offers circumstantial evidence that Scott checked on her available leave shortly after she left for the doctor's office on April 7. While this behavior reflects some frustration or suspicion on Scott's behalf, the record also showed that Stewart had an upcoming vacation for which she would not have enough leave to take after the doctor's visit. Scott informed Stewart of this when she returned from the doctor, at which time Scott observed signs of impairment in Stewart. It was this that led Scott to send Stewart for drug testing, not Stewart's taking of leave.

120. In sum, the Court concludes that the PUD's disciplinary actions were motivated by frustration about her disability—not about her use of leave. The Court thus enters judgment in the PUD's favor on Stewart's claims under the FMLA and WFLA.

### **Damages**

121. The WLAD provides for recovery of "actual damages" including: (a) past and future economic losses and (b) damages for emotional harm. Wash. Rev. Code § 49.60.030(2); *Ellingson v. Spokane Mortg. Co.*, 573 P.2d 389, 394-95 (Wash. Ct. App. 1978).

122. Stewart seeks the following damages: lost earnings and benefits (past and future); lost pension; penalty payment for early withdrawal of 401K; and compensation for emotional harm.[5]

---

[5]     Stewart also seeks compensation for adverse tax consequences, pre- and post-judgment interest, and reasonable attorney fees and costs. She may request those after entry of judgment.

*Economic Losses*

123. At the time Stewart was terminated, she was a full-time employee earning an hourly wage of $31.96. Stewart thus earned $66,476.80 on an annual basis. She also received regular cost of living adjustments under her union contract.

124. Stewart was also a member of the Public Employees' Retirement System (PERS) Plan 2, a defined benefit pension plan. Her economist expert, Dr. Paul Torelli, testified that the PERS2 pension benefits are based on the average of an employee's 60 consecutive highest paid service credit months.

125. Stewart testified that, before she was terminated, she planned to retire at age 65. Stewart was almost 49 years old when the PUD fired her.

126. Vocational expert Neil Bennett reviewed Stewart's personnel records from the PUD. These records showed progressive wage increases and included no criticism of her work performance and no discipline during the two decades preceding the events of 2014 and 2015. He opined that it was more likely than not that Stewart's employment with the PUD would have continued if the PUD had not terminated her for disability-related conduct.

127. In June 2016, Wheeler retired, meaning the PUD's Weekend CSR position became available. The Weekend CSR position was full-time with an hourly wage of $41.06, meaning an annual salary of $85,404.80. The Weekend CSR also received regular pay increases under the union contract.

128. Wheeler testified that Stewart had expressed an interest in the Weekend CSR position upon Wheeler's retirement. Selection for the Weekend CSR position is based purely on seniority. When the position previously became vacant, Wheeler was the most senior employee. Her supervisor asked if she wanted the position and she accepted, without

1    application or interview. The person who ultimately took the position had lower seniority

2    than Stewart.

129.  Based on the testimony from Stewart, Bennett, and Wheeler, the Court finds it more

likely than not that, had Stewart not been fired for disability-related conduct, her

employment at the PUD would have continued until she retired at age 65 and she would

have assumed the Weekend CSR position in June 2016.

130.  Stewart and Bennett testified that, after the PUD fired Stewart, she applied for more than

100 jobs over a span of two years. She looked for jobs both in her field and out, as well

as jobs that paid substantially less than her CSR position at the PUD.

131.  Despite this search, Stewart was unemployed from May 2015 until February 2016. To

make ends meet, she had to withdraw funds from her 401K account and paid a 10%

penalty to do so. The penalty totaled $2,225.78.

132.  In February 2016, Stewart started working for the Marysville School District as a

substitute paraeducator. The work is part-time and Stewart earns an hourly wage of

$16.00-$17.25. She earned $7,464.53 in 2016.

133.  Stewart testified that she wants to work full-time and continues to look for customer

service jobs that meet her skill set. So far, she has not obtained a full-time job comparable

to her position at the PUD.

134.  At trial, Dr. Torelli presented four possible future scenarios, each with a corresponding

amount of lost wages, benefits, and pensions: 1) Stewart returns to school and earns her

bachelor's degree; 2) Stewart continues earning income at her current rate; 3) Stewart

increases the number of hours she works as a substitute paraeducator; and 4) Stewart

finds another job as a CSR, albeit at a lower salary. The PUD did not call an expert

economist to rebut this testimony. The Court finds Dr. Torelli's testimony credible and

his methods reasonable.

135.  Based on Stewart's testimony that she wants to find a full-time job and has only been

1    able to work part-time as a paraeducator, the Court finds that the fourth scenario is most

2    likely. Under this scenario, Dr. Torelli projects that Stewart will earn $18.16 an hour.

136.   Accordingly, based on the testimony by Stewart, Bennett, and Dr. Torelli, the Court finds that Stewart's total earnings loss would be $1,034,258.00.

137.   Dr. Torelli also testified to Stewart's pension loss. Stewart's termination removed her from the PERS retirement system, substantially reducing the pension payments she will receive in the future. Dr. Torelli opined that her pension losses are approximately $765,907.00 in present discounted value.

138.   The Court also finds that the PUD caused $3,563.00 in wage loss for the period of time Stewart was on unpaid administrative leave from December 25, 2014 to January 12, 2015.

139.   The Court further awards Stewart $2,225.78 in penalties for making a 401K hardship withdrawal.

140.   In sum, the Court awards the following economic damages: $1,034.258.00 in lost earnings, $765,907.00 in lost pension, $3,563.00 in wage loss for unpaid leave, and $2,225.78 in early 401K withdrawal penalties, for a total of $1,805,953.78.

*Emotional Harm*

141.   Once a plaintiff has proved a WLAD violation, he or she is required only to "offer proof of actual anguish or emotional distress in order to have those damages included in recoverable costs." *Bunch v. King County Dep't of Youth Servs.*, 116 P.3d 381, 389 (2005) (internal quotations omitted). A plaintiff need not present expert testimony as to emotional distress; his or her own testimony can suffice. *Id.* at 390.

142.   Both Stewart and her sister, Suzette Nielson, testified credibly as to the emotional distress the PUD's actions caused Stewart. Stewart spoke of how she loved her job and was devastated to lose it. She also stated that it was humiliating to be drug tested, endure drug dependency screening, and respond to "drilling" by the PUD. Stewart felt that she was

1   treated as a criminal rather than an employee with a disability. When Stewart was without

2   a paycheck, she "really felt like [she] let [her] family down."

3   143. Nielson echoed this testimony, stating that Stewart was humiliated, emotional, and

4       confused. Nielson further testified that, after the termination, Stewart "lost all hope."

5   144. This emotional toll was exacerbated by the fact that Stewart had worked at the PUD so

6       long; it was "her rock." Dealing with the financial struggles and fruitless job searches has

7       continued to cause Stewart distress.

8   145. Based on this testimony, the Court finds that the PUD's WLAD violations proximately

9       caused Stewart emotional harm. The Court finds that the amount of money that will

10      reasonably compensate Stewart for these damages is $10,000.00.

11      *Affirmative Defenses*

12  146. The PUD asserts two affirmative defenses as to damages: after-acquired evidence and

13      failure to mitigate.

14  147. The PUD's after-acquired evidence defense[6] rests on its assertion that, during litigation,

15      it learned that Stewart returned to work less than four hours after she received migraine

16      treatment on April 7, 2015. As discussed above, the Court found this evidence

17      insignificant. Moreover, the Court has concluded that the PUD had a continuing duty at

18      that point to reasonably accommodate Stewart's disability. The after-acquired evidence

19      defense does not preclude Stewart from recovering damages.

20  148. The PUD's mitigation defense[7] is based on its assertion that Stewart has not diligently

21      sought employment since her termination. To prevail on this defense, the PUD must show

22      that "there were suitable positions available and that [Stewart] failed to use reasonable

23

24      [6] The PUD did not address this defense in its written closing argument or its proposed
        findings and conclusions. The Court addresses the argument made in the PUD's trial brief.

25      [7] The PUD did not address this defense in its trial brief, written closing argument, or
26      proposed findings and conclusions. It only cursorily raised the defense in the proposed pretrial
        order. The Court will thus address it only briefly.

1  care and diligence in seeking them." *Henningsen v. Worldcom, Inc.*, 9 P.3d 948, 958

2  (Wash. Ct. App. 2000) (internal quotations omitted). The PUD does not do so.

3  149. Both Stewart and vocational expert Neil Bennett testified about Stewart's significant

4         efforts to secure a comparable or lesser position, including applying to over 100 jobs.

5         Stewart testified that she had found sporadic work as a substitute paraeducator. On cross-

6         examination, the PUD asked whether Stewart ever chose not to accept open paraeducator

7         positions. However, this is irrelevant because the duty to mitigate requires only that a

8         former employee pursue "substantially equivalent work." *E.E.O.C. v. Pape Lift, Inc.*, 115

9         F.3d 676, 683 (9th Cir. 1997) (internal quotations omitted). The paraeducator position

10        paid Stewart only half her hourly rate at the PUD and is not available on a full-time basis.

11        The Court cannot conclude that such a position is substantially equivalent to her job at

12        the PUD. Stewart had no obligation to mitigate her damages by accepting such positions.

13 **Conclusion**

14 150. In sum, the Court enters judgment in Stewart's favor on the WLAD claims and in the

15        PUD's favor on the FMLA/WFLA claims.

16 151. On the WLAD claims, the Court awards $1,805,953.78 in economic damages and

17        $10,000.00 in emotional damages, for a total of $1,815,953.78.

18 152. Within 30 days of entry of judgment, Stewart may move for recovery of any tax

19        consequences of this award as provided for by *Blaney v. Int'l Ass'n of Machinists And*

20        *Aerospace Workers, Dist. No. 160*, 87 P.3d 757 (Wash. 2004), as well as an award of

21        pre- and post-judgment interest and reasonable attorney fees and costs, as provided in

22        Wash. Rev. Code § 49.60.030(2).

23 //

24 //

25 //

26 //

DATED this 21st day of June 2017.

John C. Coughenour
UNITED STATES DISTRICT JUDGE